**Jorge Hernandez LUNA, Plaintiff,**

v.

**Tom RIDGE, Secretary of the United States Department of Homeland Security, in his individual and official capacities, et al., Defendants.**

No. 03CV0872–LAB (AJB).

Nos. 69, 77.

United States District Court, S.D. California.

June 9, 2006.

---

Randall B. Hamud, Law Office of Randall B. Hamud, San Diego, CA, for Plaintiff.

Forrest Christian, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for Defendants.

## ORDER GRANTING DEFENDANT'S MOTION TO STRIKE AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BURNS, District Judge.

This matter is before the court on remaining defendant Border Patrol agent Steven St. Pierre's ("St. Pierre") Post–Discovery Motion For Summary Judgment ("Motion") in this *Bivens*[1] personal injury action, proceeding under a First Amended Complaint ("FAC"). Prior Orders in this case have disposed of all but one of the FAC claims and all other defendants. Plaintiff Jorge Hernandez Luna ("Luna") filed Opposition to the Motion, and St. Pierre filed a Reply, accompanied by a Motion To Strike. Luna filed Opposition to the Motion To Strike, and St. Pierre filed a Reply to that Opposition. The court finds the issues presented appropri-

---

**1.** *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Bivens* actions apply the same legal standards as those used to decide 42 U.S.C. 1983 actions. *See, e.g., Johnson v. Fankell,* 520 U.S. 911, 914–15, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997).

ate for decision on the papers and without oral argument, pursuant to Civil Local Rule 7.1(d)(1). For the reasons discussed below, defendant's Motion To Strike is **GRANTED,** and his Motion For Summary Judgment is **GRANTED,** disposing of all remaining parties and claims in this action.

## I. BACKGROUND

This court's Standing Order In Civil Cases instructs that only one joint statement of undisputed facts, signed by all parties, shall be filed in connection with motions for summary judgment or summary adjudication of issues, and fact statements not jointly submitted will be rejected. Standing Order ¶ 4. The court accordingly relies on the parties' Joint Statement of Undisputed Facts rather than their Separate Statements. Dkt No. 73.

Luna illegally reentered the United States on November 7, 2001, approximately one month after his release from prison and deportation back to Mexico. He knew his capture by Border Patrol would result in his return to prison, given his criminal record and multiple prior deportations. He selected as his point of entry a place known to the Border Patrol as the "Wickersham." That area was a dangerous place for Border Patrol agents due to its remote location near the Mexican border and the terrain of thick brush with lots of trails conducive to criminal activity, in particular drug trafficking and illegal alien entry. Undisputed Facts 1–8.

The day of the incident in 2001 giving rise to this litigation, a fellow officer notified St. Pierre that an apparent illegal alien and suspected drug trafficker was swimming the river in the Wickersham. St. Pierre drove to the area, parked his marked vehicle and, wearing his Border Patrol uniform, he moved to a location where he was likely to intercept the suspect, then hid in wait with his service

weapon drawn. He spotted the suspect, later identified as Luna, showed himself, and issued an oral command. Luna heard St. Pierre say something in English and saw the weapon, then immediately took off running toward Mexico to evade arrest. St. Pierre pursued him. St. Pierre's experience from his interactions with other aliens in similar circumstances, and from the thousands of arrests he had effected prior to November 2001, was that the vast majority of the time aliens follow his instructions. When someone resists or attempts to evade, usually more is in play than merely an illegal entry, such as drugs. The location, Luna's response, and his fellow officer's information were indications to St. Pierre that Luna might be a trafficker. Undisputed Facts 9–15, 44.

Using his hands and arms to grab him, St. Pierre intercepted Luna when Luna slipped and fell while running from St. Pierre. Luna ended up face down on the ground, with St. Pierre on top of his back. St. Pierre's arms were around Luna's chest and under him, the gun still in his hand, held flat against Luna's chest, a description that would place the gun against the ground. As St. Pierre struggled to control Luna with his hands and arms, Luna stretched his arms up and out, then back down. Undisputed Facts 12, 16–18. St. Pierre tried to control and handcuff Luna while still retaining possession of his service weapon. Luna never struck St. Pierre or attempted to take the pistol, but he stated he probably came in contact with St. Pierre's arm while wrestling on the ground. During that process, St. Pierre's weapon discharged. St. Pierre is unsure of the exact moment, although he was pulling his right hand away from Luna's grasp. Luna is also uncertain exactly when the weapon discharged, but he recalls it occurred seconds before St. Pierre grabbed his left arm and pulled it back for handcuffing. He did not immediately realize he had been shot. While St.

Pierre was handcuffing his left wrist, Luna felt something warm and reached down with his right hand to touch his leg, finding it bloody. He showed St. Pierre the blood on his hand. St. Pierre said "oh, shit" when he saw Luna was wounded.[2] Luna Depo. 90:25–91:1. St. Pierre testified he did not intentionally fire the weapon, that it discharged by accident, and he was surprised Luna was hit.[3] Undisputed Facts 21–27, 48.

A federal investigation ensued. FBI agents collected evidence, including an examination of St. Pierre's duty weapon and contemporaneous interviews with Luna, St. Pierre, and several Border Patrol employees. The weapon, a .40 caliber semi-automatic pistol, was caked with sand from the site of the shooting, to the extent that the slide would not come back. It also failed to eject the spent shell casing, and the primer hit on the spent cartridge casing was off-center, leading investigators to conclude an outside force interfered with normal functioning. One explanation for that condition was the weapon had been pressed into the sand. Undisputed Facts 28–33, 39. Although supervisory and various investigative and review reports concluded the facts of the shooting point to accidental discharge (a conclusion Luna reserves the right to challenge), one report questions the need to have drawn the pistol in the first place. St. Pierre was also carrying a collapsible steel baton that day. He had been trained in hand-to-hand com-

bat and handcuff techniques at the Border Patrol Academy, as well as in the use of deadly force for use when he, his partner, or the general public is threatened. Undisputed Facts 35–42.

The bruises and minor scrapes both men suffered confirm a physical confrontation occurred. Medical records from Yuma Regional Medical Center show Luna was not treated for any injuries except from the gunshot wound giving rise to this litigation. Undisputed Facts 10–20. Luna's "right lower extremity shows an entrance wound posteriolaterally with exit wound more anteriorly and laterally," with the "smaller wound higher than the larger wound." Undisputed Fact 34. Luna's ability to perform sustained permanent work has been compromised due to his leg injury.

The sole remaining cause of action is a claim for use of excessive and deadly force stated against St. Pierre individually. FAC ¶¶ 10–11. St. Pierre moves for summary judgment in his favor on grounds there is no evidence he intentionally shot Luna, as is required to prevail on a Fourth Amendment excessive force claim, and he is also entitled to qualified immunity.

## II. MOTION TO STRIKE

■ St. Pierre moves to strike three categories of evidence Luna produced in opposition to the Motion. The first objection relates to two photographs Luna pro-

---

**2.** "Q: Now, when you touched the blood with your right hand, did you raise your right hand to show the officer the blood? A: Yes. Q: Did he say anything to you in any language? A: Yeah, but I didn't—Q: Do you remember? A: 'Oh, shit,' or something like that. He told me something like that." Luna Depot 90:18–91:1.

**3.** The parties' depositions posit different versions of events leading up to the weapon discharge. St. Pierre testified Luna aggressively and physically resisted him. Luna

complains St. Pierre's account of events has been inconsistent. However, under both sides' versions of events, at the time the bullet wounded Luna, the men were on the ground with St. Pierre trying to handcuff Luna while still holding his service weapon. The shooting is the only conduct alleged in support of the Fourth Amendment claim. The court relies on the Joint Statement of Undisputed Facts and Luna's testimony as well as factual inferences taken in the light most favorable to Luna as the non-moving party in deciding the motion.

duces for the first time as Exhibit DDD to his Statement Of Facts In Opposition To Defendant St. Pierre's Motion For Summary Judgment, alleged to be July 2003 photographs Luna's attorney took of Luna's leg as it appeared about twenty months after the injury. Even if the court considered evidence attached to the rejected Separate Statements, and notwithstanding Luna's counsel's explanation for the delay,[4] the photographic evidence is excluded as produced in an untimely manner prejudicial to St. Pierre. This action was first filed over three years ago, about two months before the photographs were taken. The docket reveals considerable controversy, judicial intervention, and delay surrounding procedural anomalies and discovery issues for much of that time. The Scheduling Order entered July 13, 2005 set December 30, 2005 as the discovery cut-off deadline. On January 4, 2006, the parties stipulated to extend that deadline to March 1, 2006, reciting Luna had been deposed November 16–17, 2005 and additional medical examinations and other discovery was warranted. Dkt No. 64. The court granted the discovery extension, but rejected any further delay in the prosecution and resolution of this case, as the Pre–Trial Conference is presently calendared for June 26, 2006. Luna produced the two photographs for the first time on April 11, 2006 in connection with his Opposition to

St. Pierre's summary judgment motion, giving no prior notice of their existence. Defense preparations would be compromised were the court to admit at this late date July 2003 photographic evidence of Luna's injuries, particularly as Luna purports to use the photographs to discredit defendant's expert's characterization of the trajectory of the bullet. Discovery definitively closed March 1, 2006. The photographs are stricken.

■ St. Pierre also moves to strike from Luna's Opposition papers "all paragraphs that rely on speculation or conjecture by [Luna's] attorney," including in particular Hamud Declaration paragraphs 33 and 38, where counsel abstractly theorizes about what might have happened during the parties' struggle and what St. Pierre might have been thinking. Motion To Strike 3:2–3. Counsel's opinions and argument are not evidence. The court disregards all such speculation and conjecture as lacking even a scintilla of probative value, let alone the capability to raise a triable issue of material fact.

Finally, St. Pierre moves to strike "all misrepresentations of plaintiff's testimony by his counsel," in particular counsel's suggestions that Luna was shot after he was handcuffed, a representation the court has independently verified is unequivocally contradicted by Luna's deposition testimony.[5] The court relies on the Joint State-

---

4. Luna's counsel represents he inadvertently failed to develop the roll of film on which he had photographed Luna's condition on July 23, 2003, including "the entry and exit wounds on his lower right leg" purportedly depicted in his Exhibit DDD. Hamud Decl. ¶ 2. He represents the film "lay in a tray on my work table from 2003 until early February 2006." *Id.* He declares he took the film along with two other rolls for developing on January 31, 2006, having "forgotten that [he] had photographed Mr. Hernandez–Luna's wounds." *Id.* ¶ 3. He did not look at the photos until April 2006, and was surprised to see those of Luna. *Id.*

5. "Q: He's handcuffing you and you've already been shot, correct? A: Yes." Luna Depo. 35:4–6. "Q: So you were shot before he grabbed your left arm; is that correct? A: Yes." *Id.* 39:1–3. "Q: When he grabbed your left hand, you had already been shot, correct? A: Yes." *Id.* 10:19–21. "Q. Your right arm is still free? A: Yes, well not that long—... because when I lowered it down and felt the blood, I say, 'I got blood on me.' He grabbed it and handcuffed it. Q: He grabbed your right arm and handcuffed it? A: He handcuffed it. Q: so then both your arms were in handcuffs, right? A: Yes. Q: And you asked him about the blood before he pulled your

ment of Undisputed Facts and timely-produced, admissible evidence submitted in support of or in opposition to the Motion For Summary Judgment. The court relies on neither party's Separate Statement of Facts, Objections to Separate Statement of Facts, or other unauthorized or incompetent evidence, including counsel's gratuitous characterizations of the evidence. To the extent St. Pierre's Motion To Strike addresses such objectionable material, it is *GRANTED*.

### III.  MOTION FOR SUMMARY JUDGMENT

#### A.  *Legal Standards*

Federal Rule of Civil Procedure ("Rule") 56(c) empowers the court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c) (emphasis added); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir.2001). A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305–1306 (9th Cir.1982) (disputes over material issues of fact "require[ ] a trial to resolve the parties' differing versions of the

truth"). "If reasonable minds could differ," the judgment should not be entered in favor of the moving party. *Anderson*, 477 U.S. at 250–251, 106 S.Ct. 2505 (although summary judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict").

Where the plaintiff bears the burden of proof at trial, summary judgment for the defendant is appropriate if the defendant shows that there is an absence of evidence to support the plaintiff's claims. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *see also Garneau v. City of Seattle*, 147 F.3d 802, 807 (9th Cir.1998). The movant has the initial burden of demonstrating that there is no genuine issue of material fact and that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Arpin*, 261 F.3d at 919. The movant is not required to produce evidence negating the non-movant's claims. *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

If the movant carries its burden, the burden then shifts to the non-moving party to set forth facts showing that there remains a genuine issue of disputed material fact so that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. A non-moving party must present significant probative evidence to support the claim and may not simply rely on the pleadings. *T.W. Elec. Services, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). The court is to believe the non-movant's evidence and draw all justifiable inferences in his or her favor. *Anderson*, 477 U.S. at 255, 106

right arm back? A: Yes. Q: And after you asked him about the blood he then pulled your right arm behind your back and handcuffed you, correct? A: Yes." *Id.* 42:5–25. "Q: Okay. Just to be clear, was your left wrist

already handcuffed when you felt the blood with your right hand? A: Yes. Q: Did you actually feel the bullet enter your leg? A: No." *Id.* 90:5–13.

S.Ct. 2505. However, summary judgment is appropriate if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. *Id.*

In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the **facts specifically averred by that party** contradict facts specifically averred by the movant, the motion must be denied. **That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint**.... Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "**set forth specific facts** showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.

*Lujan,* 497 U.S. at 888–889, 110 S.Ct. 3177 (citations omitted) (emphasis added) ("the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues").

### B. *Fourth Amendment*

██ Luna's use of excessive force claims must be measured by the Fourth Amendment's "reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("all claims that law enforcement officers used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment ... rather than under a 'substantive due process' approach" under the Fifth Amendment).

"Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). For a seizure to trigger the Fourth Amendment's protections, government actors must have restrained the liberty of a citizen "by means of physical force or show of authority." *Graham,* 490 U.S. at 395 n. 10, 109 S.Ct. 1865. That restraint must be effectuated *"through means intentionally supplied." Brower v. County of Inyo,* 489 U.S. 593, 596–97, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (finding police officers stopped a suspect they were chasing by means of a roadblock, constituting a Fourth Amendment "seizure," when the car crashed into the police barricade erected for the purpose of stopping him, killing him, but remanding for consideration whether the seizure was "unreasonable"). An actionable seizure occurs only if the person is "stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower,* 489 U.S. at 599, 596, 109 S.Ct. 1378 ("Violation of the Fourth Amendment requires an intentional acquisition of physical control" entailing intended consequences of the challenged government action "through means intentionally applied"). The roadblock in *Bower* was "not just a significant show of authority to induce a voluntary stop, but [was] designed to produce a stop by physical impact if voluntary compliance [did] not occur." *Brower,* 489 U.S. at 598, 109 S.Ct. 1378.

"[T]he Fourth Amendment addresses 'misuse of power', ... not the accidental effects of otherwise lawful government conduct." *Brower,* 489 U.S. at 596–97, 109 S.Ct. 1378, *quoting Byars v. United States,* 273 U.S. 28, 33, 47 S.Ct. 248, 71 L.Ed. 520 (1927). The test for excessive force limits the question presented to "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances

confronting them." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865. St. Pierre offers authority for the proposition an officer's use of arms and hands to effectuate an arrest during which time the officer's weapon accidently fires and stops the suspect by that unintentional means does not provide a foundation for a Fourth Amendment excessive force claim predicated on the theory the use of a gun was unreasonable. *See Pleasant v. Zamieski*, 895 F.2d 272, 273, 277 (6th Cir.1990); *see also Andrade v. City of Burlingame*, 847 F.Supp. 760, 764 (N.D.Cal.1994) (police dog bite did not implicate the Fourth Amendment because the officer did not intend to use the police dog as the means to subdue the plaintiffs, who were already seized when the dog escaped from the patrol car and bit them).

The FAC alleges St. Pierre "shot Plaintiff," "that in shooting Plaintiff, St. Pierre acted unreasonably," and "that St. Pierre's shooting of Plaintiff evidences St. Pierre's callous and reckless disregard for, and deliberate indifference to, Plaintiff's constitutional rights." FAC ¶¶ 10–11; Mot. 5:13–18. To prevail on his theory the shooting violated his Fourth Amendment rights, Luna must produce evidence that the shooting was both intentional and unreasonable. *Brower*, 489 U.S. at 596–97, 109 S.Ct. 1378; *see Forrester v. San Diego*, 25 F.3d 804, 806 (9th Cir.1994). The evidence—including Luna's own deposition testimony—is undisputed that St. Pierre had his service weapon drawn when he first confronted Luna, Luna ran away from St. Pierre, St. Pierre was able to grab Luna when Luna slipped and fell, and at the time St. Pierre's service weapon discharged, he and Luna were both grappling on the ground while St. Pierre attempted to handcuff him. St. Pierre's arms were around Luna's chest. His hand with the weapon in it was lying flat against Luna's chest while St. Pierre was lying on Luna's back, with Luna was face down on the ground. Luna estimates only "a few seconds" elapsed from the time St. Pierre first had his arms around Luna and the gunshot. *See* Luna Depo. 33–41.

As a moving party who does not bear the burden of proof on the claim, St. Pierre has carried his burden to show Luna has no admissible evidence—"not the ballistics, not the post-incident interviews, and not the deposition transcripts" (Reply 2:15–18)—to support even a reasonable inference that St. Pierre shot him on purpose as the means to effectuate the seizure, so that no disputed issue of material fact on that element remains to be decided.[6] *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. Luna testified seeing St. Pierre with his the gun drawn caused him to run away toward Mexico rather than to stop and submit to the border authorities.

There is no dispute that Luna and St. Pierre engaged in a physical struggle while St. Pierre attempted to handcuff Luna after grabbing him when he fell to the ground. There is no dispute the bullet from St. Pierre's gun struck Luna in the leg during their struggle. However, "[e]ven plaintiff himself has been unwilling to say that the shooting was intentional."

---

6. "Q: When you were running on the path when this first happened, were you running in the direction of the agent? A: No. Towards Mexico. Q: Why were you trying to run from the agent when he had his gun drawn? A: Because I didn't want to wind up again in prison." Luna Depo. 44:12–19. "Q: Earlier when you said you were running on the path and the agent was running to intercept you on the path, right—A: Yes. Q:—and the agent put his arms around you from your back—A: Yes. Q:—did you see him reach out for you? A: No. I felt—I didn't see anything. I just felt his arms. Q: Was this after you slipped? A: It was right then at that same time as I was crawling away. Q: Okay. So when you had slipped and you were crawling away, you didn't see him at that time, right? A: Uh-huh. Yes. I just felt him." Luna Depot 798–23.

Reply 2:18–19. Luna has presented no "sworn averment" of the specific fact of St. Pierre's alleged intentional shooting. *Lujan*, 497 U.S. at 888–89, 110 S.Ct. 3177. Luna's burden in opposing the Motion became to offer evidence from which a reasonable jury could find St. Pierre intentionally discharged his weapon to shoot him. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. To meet his burden, Luna needed to go beyond the pleadings, using affidavits or depositions, answers to interrogatories, and admissions on file to designate specific facts sufficient for a jury to make such findings. Rule 56(c). Luna has designated no specific fact to support even a reasonable inference St. Pierre intentionally fired his weapon, let alone intentionally shot him. He goes no further than to indicate he is not sure.

Q: Going back to the shooting incident, when the agent grabbed you from behind, right—

A: Yes.

Q: —Do you think the agent intended to shoot you? . . .

The Witness: I don't—I just didn't know—I just saw him with a gun in his hand, and I just started running away.

Q: Do you think the shooting was an accident? . . .

The Witness: I don't know if he could have done that on purpose or anything. I don't know anything. I saw him with a gun in his hand.

Q: Can you think of any reason why the agent would have wanted to shoot you?

A: No. . . .

Luna Depo. 59:6–60:20.

A plaintiff must show more than some "metaphysical doubt" as to the material facts by coming forward with "specific facts showing that there is a *genuine issue*

*for trial."* *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1985) (emphasis added). Attempts to discredit St. Pierre's evidence (such as his expert's opinions) are not a substitute for evidence creating a material factual dispute requiring resolution by a jury, as is required to defeat a properly supported summary judgment motion. *T.W. Elec. Serv.*, 809 F.2d at 630, 631 ("the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor on that evidence").

Summary judgment may be entered when an essential element of a legal theory is shown to lack evidentiary support, irrespective of factual disputes over other aspects of the claim. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Negligent or accidental conduct by police officers does not rise to the level of a constitutional violation. Torts which happen to be committed by public officials are not actionable as constitutional claims. *See Andrade* and cases cited therein; *Edwards v. Giles*, 51 F.3d 155, 157 (8th Cir.1995); *Brower*, 489 U.S. at 596–97, 109 S.Ct. 1378 (a seizure must be willful to be actionable under the Fourth Amendment). Although Luna purports to suggest other conduct at the time was also unreasonable, "being shot" is the sole foundation of his Fourth Amendment claim alleged against St. Pierre. The reasonableness of St. Pierre having drawn his gun in these circumstances and location while waiting for the opportunity to apprehend Luna, or later the use of his hands to seize Luna while still holding the gun, are not challenged in the FAC as unconstitutionally unreasonable conduct.[7] St. Pierre

---

7. St. Pierre argues Luna could not make a case under such belated theories anyway. For example, seizures implicating the Fourth

Amendment require the use of physical force or a suspect's submission to authority,

argues "plaintiff's failure to identify specific facts in the record showing that he was intentionally shot obviates any need for consideration of whether the discharge was reasonable or not." Reply 6:14–16. Luna has presented no evidence which could support a finding by a reasonable trier of fact that St. Pierre violated Luna's Fourth Amendment rights on the grounds alleged, entitling St. Pierre to summary adjudication of the Fourth Amendment claim as a matter of law.

### C. *Qualified Immunity*

■ Qualified immunity shields public officials from liability for civil damages as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."[8] *Franklin v. Fox*, 312 F.3d 423, 437 (9th Cir.2002). A right is "clearly established" if "it would be clear

to a reasonable officer that his or her conduct was unlawful in the situation confronted." *Ganwich v. Knapp*, 319 F.3d 1115, 1124 (9th Cir.2003). As Luna observes, Fourth Amendment "excessive force" cases and "qualified immunity" analyses are similar because the fundamental question in each is the objective reasonableness of the officer's conduct. Opp. 2:3–7, *citing Santos v. Gates*, 287 F.3d 846, 855 n. 12 (9th Cir.2002); *see also Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir.2005).

Qualified immunity analysis is "essentially legal." *Franklin*, 312 F.3d at 437 ("Our inquiry is an objective one, based on what a reasonable officer would believe if faced with the 'facts and circumstances' actually known to the officer in question"); *see Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (the qualified immunity inquiry is the province

whereas the fact that St. Pierre decided to draw his weapon did not constitute a seizure at all, inasmuch as Luna ignored that show of force and authority and started running to avoid arrest. *See* Reply 7:17–21; *Edwards*, 51 F.3d at 157 (pointing weapon at suspect who does not submit to that show of authority does not constitute a seizure). Even if the drawing of the gun constituted a seizure, St. Pierre contends—based on the facts and circumstances agreed by the parties in their Joint Statement of Undisputed Facts—the seizure would have been an objectively reasonable one. Reply 7:21–8:1. Moreover, he argues "a Fourth Amendment claim cannot be based on St. Pierre's decision not to holster his weapon prior to his seizure of plaintiff." Reply p. 8 n. 10, *citing Pleasant*, 895 F.2d at 276; *Matthews*, 699 F.Supp. at 1553–54. No other alternative basis emerges from the facts presented that could sustain a Fourth Amendment violation claim. *See, e.g., United States v. Dykes*, 406 F.3d 717, 720 (D.C.Cir.2005) ("because [plaintiff] was in full flight from officers who were justified in stopping him, tackling him was a reasonable method of effectuating the stop" and handcuffing was a reasonable step to ensure suspect could not use any weapon he may have had); *Miller v. Clark County*, 340 F.3d 959,

965 (9th Cir.2003) (a use of non-deadly force case observing "a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death"); *see United States v. Montoya de Hernandez*, 473 U.S. 531, 539–40, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (interests of law enforcement entitled to greater weight at the international border). There is no dispute in this case that Luna was committing a felony at time of the incident.

8. "If an official could reasonably have believed her actions were legal in light of clearly established law and the information she possessed at the time, she is protected by qualified immunity." *Franklin*, 312 F.3d at 437, *citing, inter alia, Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "Thus, a two-part test controls our qualified immunity analysis. First, we must determine whether the law that governs the official's conduct was clearly established. Second, we must consider whether a reasonable officer could have believed the conduct was lawful." *Id.,citing Saucier*, 533 U.S. at 201–02, 121 S.Ct. 2151, *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir.1993).

of the court). Courts may dispose of excessive force claims on qualified immunity grounds even where there are disputed issues of fact. *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The analysis proceeds in two steps. First, the court determines whether, "[t]aken in the light most favorable to the party asserting the injury, the facts alleged show the Defendant's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. If no clearly established constitutional right was violated, there is no need for further analysis, and the defendant is entitled to judgment on the constitutional claim. *Id.* The second step entails assessment of whether it was objectively reasonable for the officer to believe the conduct was lawful. *Id.*

Broad generalities in the articulation of the constitutional right at issue (such as Luna's characterization that St. Pierre "knew on the day in question that the inappropriate use of deadly force could deprive Plaintiff of his constitutional rights" (Opp.8:11–12)) are insufficient to identify a clearly established right purportedly violated at the level of specificity required to assess the officer's conduct in the particular circumstances confronted. *See Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (if general allegations of abstract rights were enough, "Plaintiffs would be able to convert the rules of qualified immunity that our cases plainly establish into a rule of unqualified liability simply by alleging violation of extremely abstract rights"). Luna points to no fact or evidence to support his conclusory allegation that St. Pierre engaged in "inappropriate use of deadly force," particularly as he has not demonstrated he could prove St. Pierre willfully shot him. He identifies no "clearly established law" against which to measure the particular conduct and circumstances of this case, whereas "[i]n the light of pre-existing law, the unlawfulness must

be apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. "[R]eviewing courts must not view constitutional rights in the abstract, but rather 'in a more particularized, and hence more relevant, sense.'" *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir.1998), *quoting Anderson*, 483 U.S. at 640, 107 S.Ct. 3034.

The specific circumstances of the particular case must be considered to "define the contours of the right allegedly violated in a way that expresses what is really being litigated," as the first step in the qualified immunity analysis. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1158 (9th Cir.2000). The plaintiff bears the burden of identifying a right that was "clearly established" at the time of the allegedly impermissible conduct. *Id.* at 1157; *Brewster*, 149 F.3d at 977. Luna's burden to overcome qualified immunity is to show St. Pierre's conduct in the circumstances involved a seizure effectuated by an intentional shooting when deadly force was not necessary. If the plaintiff cannot meet that burden, the defendant is entitled to judgment as a matter of law. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151; *see Hunter*, 502 U.S. at 227–29, 112 S.Ct. 534 ("the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of events can be constructed" after the fact). The Ninth Circuit accords broad discretion "to officers who face tense situations," and recognizes "the importance of granting immunity even when officers make mistakes." *Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir.2001).

In this case, the inquiry terminates at step one. Luna failed to demonstrate a triable issue of material fact from which a reasonable jury could conclude the shooting was anything but an accident. The facts are undisputed that the area where

St. Pierre was informed a suspected felony drug trafficker was observed entering the United States was remote and brushy, known to be a high crime area near the border. He was working the area alone. Luna cites no clearly established authority for a proposition it was unreasonable for St. Pierre to have his service weapon drawn while he waited for the opportunity to apprehend a suspected drug trafficker. He displayed the gun when he first confronted Luna, who attempted to flee despite St. Pierre's show of authority and force. He did not use the weapon to shoot Luna as he fled, but rather ran after him. The shooting occurred during a physical struggle with both men grappling on the ground. Luna has testified he was not shot before they were on the ground, and that he was not shot after he was handcuffed, but rather St. Pierre's gun discharged while St. Pierre was in the process of getting Luna's hands behind his back to handcuff. Absent purposeful conduct by St. Pierre to wound him, Luna can neither prevail on an essential element of his remaining claim, nor defeat qualified immunity. Accidental injury cannot support a finding a plaintiff's Fourth Amendment rights were violated in the course of an otherwise lawful arrest, and no other constitutional right is alleged to have been infringed. The same dearth of specific facts from which a reasonable jury could conclude St. Pierre intentionally shot Luna also requires summary adjudication of the excessive force underpinning of the qualified immunity defense in St. Pierre's favor for failure to show his conduct was objectively unreasonable under clearly established law. "[I]f, under the governing law, there can be but one reasonable conclusion as to the verdict," summary judgment must be entered. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505.

## IV.   CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** Defendant's Motion To Strike is *GRANTED,* and Defendant's Motion For Summary Judgment is *GRANTED,* disposing of all parties and all claims. All remaining court dates are *VACATED* as moot.

**IT IS SO ORDERED.**